Nos. 227, 917, Dockets 96–9181, 97–7159.

United States Court of Appeals, Second Circuit.

Argued Oct. 8, 1997.

Decided Nov. 21, 1997.

Ralph J. BAVARO; Elizabeth C. Hogan Plaintiffs–Appellants,

v.

George E. PATAKI, individually, and as Governor of the State of New York; James G. Natoli, individually, and as Director of the State Operations of the State of New York; Barbara Ann Debuono, individually, and as Commissioner of the New York State Department of Health; Karen Schimke, individually,

Richard C. Hamburger, Melville, NY (David N. Yaffe, Lane T. Maxson, of counsel), for Plaintiffs–Appellants.

Lisa LeCours, Assistant Attorney General for the State of New York, Albany, NY (Dennis C. Vacco, Attorney General for the State of New York; Peter H. Schiff, Deputy Solicitor General, Nancy A. Spiegel, Assistant Attorney General, of counsel), for Defendants–Appellees.

Christopher Dunn, Arthur N. Eisenberg, Norman Siegel, New York City, for Amicus Curiae New York Civil Liberties Union.

Before: KEARSE, CABRANES, Circuit Judges, and CHIN, District Judge.[*]

JOSÉ A. CABRANES, Circuit Judge:

In this appeal, we are asked to consider whether the positions of Associate Counsel and Assistant Counsel in the New York State Department of Health, Division of Legal Affairs, Bureau of Professional Medical Misconduct ("Bureau"), are subject to dismissal on the basis of political affiliation, or whether instead they are protected against such political patronage dismissals under the First Amendment to the United States Constitution.

Plaintiffs-appellants Ralph Bavaro and Elizabeth Hogan, who were employed as Associate and Assistant Counsels, respectively, until they were fired on April 7, 1995 to "make room" for political appointees of defendant-appellee George E. Pataki, Governor of New York, filed separate actions seeking damages and injunctive relief pursuant to 42 U.S.C. § 1983. They each alleged that their dismissals violated the First Amendment. Plaintiffs and defendants in both actions filed cross-motions for summary judgment. The United States District Court for the Northern District of New York (Thomas J. McAvoy, *Chief Judge* ) granted summary judgment in favor of defendants in both actions, holding that the positions of Associate and Assistant Counsel are not entitled to First Amendment protection against patronage dismissals.[2] Because we agree with the district court that, under controlling precedents, these positions entail duties that make First Amendment protection unavailable, we affirm.[3]

---

2. The Bavaro and Hogan actions were consolidated for purposes of this appeal.

3. In light of our holding that no First Amendment violation occurred, we need not address defendants' claim to qualified immunity under *Harlow v. Fitzgerald,* 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982).

## I.

Ralph Bavaro served as an Associate Counsel at the Bureau from 1984 to 1989, and returned to the Bureau in the same position in 1992. Elizabeth Hogan was appointed as a Bureau Assistant Counsel on April 20, 1994. Both were dismissed after the election of Governor Pataki, and there is no dispute among the parties that political affiliation was the basis for their dismissal. Specifically, for purposes of this appeal, defendants concede that plaintiffs were dismissed in order to permit the appointment of new counsel by the incoming administration.[4] We therefore confine our inquiry to whether plaintiffs were protected by the First Amendment against dismissal on that basis.

The Bureau is responsible for prosecuting charges of professional misconduct brought against physicians and their assistants in disciplinary hearings before the Board of Professional Medical Misconduct ("Board"). *See* N.Y. Pub. Health Law § 230 (McKinney Supp.1997). Grounds for misconduct charges range from gross negligence and incompetence to harassment, sexual abuse, race discrimination and drug or alcohol abuse. *See* N.Y. Educ. Law § 6530 (McKinney Supp.1997). The chain of events leading to a disciplinary proceeding before the Board begins with an ·investigation by the Office of Medical Misconduct ("Office"). *See* N.Y. Pub. Health Law § 230(10)(a)(i). Those cases that are not resolved at this stage are reported to an Office screening committee, which makes a recommendation as to whether charges should be filed. If the Director of the Office determines that a hearing is warranted, he or she directs the Bureau to prepare charges. See id. § 230(10)(a)(iii)-(iv). The case is then assigned to an Associate or Assistant Counsel, who drafts the charges, but is not authorized to sign them. Once charges have been filed, it is the job of the designated Associate or Assistant Counsel to prosecute the State's case before the Board.

The record contains three job descriptions defining the responsibilities of the Associate and Assistant Counsels. While these job descriptions are not in conflict with one another, neither are they identical, and some are more detailed than others. The parties, however, appear to agree that the job descriptions are all equally valid, and that none was meant to supersede the others.

According to the more detailed of these descriptions, the Associate Counsel is principally expected to

> [p]repare and present the [Office's] case against a physician in hearing .... [d]etermine litigation strategy for each case, taking into account the quality of the investigative work, impact on public policy, impact on patients and tactics of opposing Counsel .... [p]resent cogent oral opening and closing statements summarizing the State's case; introduce and present evidence necessary to prove the charges as well as oppose the respondents' arguments by appropriate objection, cross-examination and oral argument .... draft statement of charges .... [p]repare written briefs and proposed findings of fact, and conclusions .... [a]ssist in supervising and directing the work of Assistant Counsels and, as necessary, Senior Attorneys .... [a]dvise Department of Health program staff [on] aspects of Professional Medical Conduct .... [perform o]ther related duties.

The Assistant Counsel's job description largely accords with that of the Associate Counsel, except that the Assistant Counsel is said to assist in the development of litigation strategy only "in the more routine cases," and, unlike the Associate Counsel, does not supervise other attorneys.

---

4. Defendants argued before the district court that plaintiffs were not singled out for dismissal because of their individual political affiliations, but rather, that they were randomly dismissed to "make room" for political appointees, and that this does not constitute discrimination on the basis of political affiliation as a matter of law. The district court rejected this position, holding that it relies on a "distinction without a difference." *Hogan v. Pataki*, 953 F.Supp. 22, 26 (N.D.N.Y.1997) (citing *Bennis v. Gable*, 823 F.2d 723, 731–32 (3d Cir.1987) (holding that dismissal of a state employee to "make room" for political appointees can be viewed as penalizing the dismissed employee for "a failure to support" the incumbent administration)). Because for purposes of this appeal defendants now concede that they discriminated on the basis of political affiliation, we express no view on this aspect of the district court's ruling.

It is undisputed that both the Associate Counsel and Assistant Counsel positions are classified as "exempt" from protection under New York State's civil service system.[5] The record indicates that these positions were originally non-exempt, but were re-classified in 1982 by the New York State Civil Service Commission ("Commission") at the urging of the Department of Health ("Department"). In a September 22, 1982 letter to the President of the Commission, seeking re-classification to exempt status, the Department explained that Associate and Assistant Counsels "must be able to reflect the views of the Counsel and the [Health] Commissioner in oral appearances . . . and demonstrate the utmost discretion in handling these cases. To insure that the Commissioner's views are appropriately reflected, the Agency needs maximum flexibility in selection, retention and remuneration."

## II.

We review the district court's orders granting summary judgment *de novo*. Summary judgment is appropriate if there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986); *Scaria v. Rubin,* 117 F.3d 652, 653 (2d Cir.1997) (per curiam). The parties do not argue, and we do not find, that there are genuine issues of material fact to be tried. Rather, the parties dispute whether the positions of Associate and Assistant Counsel are protected against political patronage dismissals as a matter of law.

The Supreme Court first recognized the principle that patronage dismissals may infringe upon government employees' First Amendment rights to political belief and association in the plurality opinion of Justice Brennan in *Elrod v. Burns,* 427 U.S. 347, 372–73, 96 S.Ct. 2673, 2689–90, 49 L.Ed.2d 547 (1976) (plurality opinion). The plurality in *Elrod* also acknowledged the need of a newly elected administration for political loyalty among at least some of its employees "to the end that representative government not be undercut by tactics obstructing the implementation of policies of the new administration, policies presumably sanctioned by the electorate." *Id.* at 367, 96 S.Ct. at 2687. The plurality concluded that "[l]imiting patronage dismissals to policymaking positions is sufficient to achieve this governmental end," while conceding that "[n]o clear line can be drawn between policymaking and non-policymaking positions." *Id.*

Subsequently, in *Branti v. Finkel,* 445 U.S. 507, 100 S.Ct. 1287, 63 L.Ed.2d 574 (1980), a majority of the Court reaffirmed that patronage dismissals may contravene the First Amendment. *Id.* at 517, 100 S.Ct. at 1294. However, the Court refined the *Elrod* plurality's test for distinguishing between positions that are protected against patronage dismissals and those that are not. "In sum, the ultimate inquiry is not whether the label 'policymaker' . . . fits a particular position; rather, the question is whether the hiring authority can demonstrate that party affiliation is an appropriate requirement for the effective performance of the public office involved." *Id.* at 518, 100 S.Ct. at 1295. As the *Branti* Court observed, political affiliation is not always relevant even to the job of a policymaker. *Id.* ("The coach of a state university's football team formulates policy, but no one could seriously claim that Republicans make better coaches than Democrats, or vice versa. . . .").

In *Branti,* two Assistant Public Defenders brought suit alleging that a newly appointed Democratic Public Defender was about to dismiss them solely because they were Republicans. *Id.* at 509–10, 100 S.Ct. at 1290–91. The Court held that an Assistant Public Defender could not be dismissed based on political affiliation because "[t]he primary, if not the only, responsibility of an [A]ssistant [P]ublic [D]efender is to represent individual citizens in controversy with the State . . . . his duty is not to the public at large." *Id.* at 519, 100 S.Ct. at 1295 (internal quotation marks and citation omitted). In a suggestive

---

**5.** Under New York law, certain state employees are classified as "exempt" from the civil service laws' protection against dismissal. *See* N.Y. Civ. Serv. Law §§ 41, 75 (McKinney Supp.1997).

footnote, the Court added that "[t]his is in contrast to the broader public responsibilities of an official such as a prosecutor," although it "express[ed] no opinion" as to whether a prosecutor's deputy would be subject to patronage dismissal. *Id.* at n. 13.

█ We have understood *Branti* as standing for the proposition that "political affiliation is an appropriate [job] requirement when there is a rational connection between shared ideology and job performance." *Savage v. Gorski,* 850 F.2d 64, 68 (2d Cir.1988). In determining whether a government employee's position is protected under this standard, we look primarily to the "inherent duties of the position," *Gordon v. County of Rockland,* 110 F.3d 886, 888 (2d Cir.), *cert. denied,* —— U.S. ——, 118 S.Ct. 74, —— L.Ed.2d —— (1997) (internal quotation marks and citation omitted), not the actual duties performed by the employee in a particular case. "Our analysis of the inherent duties ... focuses on the job description of that position." *Vona v. County of Niagara,* 119 F.3d 201, 207 (2d Cir.1997); *see Gordon,* 110 F.3d at 888 ("The idea that job performance (rather than job description) should control *Elrod–Branti* analysis has been consistently rejected by this court and others.").

█ In determining whether a "rational connection" exists between political affiliation and performance of the inherent duties of a position, we have looked to several factors, including whether the employee: "(1) is exempt from civil service protection, (2) has some technical competence or expertise, (3) controls others," *Vezzetti v. Pellegrini,* 22 F.3d 483, 486 (2d Cir.1994), and (4) "is empowered to act and speak on behalf of a policymaker, especially an elected official," *Gordon,* 110 F.3d at 890 (summarizing other factors addressed in *Vezzetti*). These factors "should not be mechanically applied, nor should [they] begin and end the analysis." *Id.*

█ Application of these factors in the instant case suggests that the positions of Associate and Assistant Counsel are not protected against patronage dismissal. Both positions are exempt from New York State's civil service laws, a factor "which has been considered important by this circuit," *Gordon,* 110 F.3d at 890. *See Regan v. Boogertman,* 984 F.2d 577, 580 (2d Cir.1993) ("New York has considered many of the same criteria for non-civil service status as does a court in determining whether a position is exempt from First Amendment protection."). We have emphasized that although we will not presume that positions defined as "exempt" from civil service protection are necessarily exempt from First Amendment protection, *see Gordon,* 110 F.3d at 890 n. 5, interests of federalism and conservation of judicial resources counsel "substantial deference to the state's judgment where government positions are so defined," *Savage,* 850 F.2d at 69.[6]

We also have no difficulty concluding that successful prosecution of professional medical misconduct charges requires considerable "technical competence and expertise." The third factor ("control over others") weighs against First Amendment protection for Associate Counsels, who oversee Assistant Counsels and Senior Attorneys, but in favor of protection for Assistant Counsels, who apparently have no supervisory responsibilities over other attorneys. Finally, although Associate and Assistant Counsels are not empowered to speak directly on behalf of an elected official, they represent the State in proceedings before the Board, and must therefore reflect the views of policymakers in their dealings with the Board and with the physicians whom they prosecute. These factors, of course, are not "an exhaustive list of indicators, nor is any one factor or group of them always dispositive." *Vezzetti,* 22 F.3d at 486.

We also find instructive our recent decision in *Vona.* In that case, two Assistant Attorneys for the Niagara County Department of Social Services, both Republicans, were dis-

---

6. In *Savage,* we further observed that

[o]therwise, federal courts will be embroiled in determining at each change of state or local administration which positions are appropriately within the political patronage system. Such a determination not only creates the possibility of a super-civil service overseen by the courts, but allows the federal judiciary to intrude undesirably into the very structure of state and local governments.
850 F.2d at 69.

missed after the Democratic Party took control of the County Legislature. They claimed that their positions were protected under *Elrod, Branti* and their progeny. *See Vona,* 119 F.3d at 203. The job description for Assistant Attorneys in *Vona* was remarkably similar to the job descriptions for Assistant Counsels in the instant case.[7] The Assistant Attorneys handled "day-to-day court proceedings" in Family Court. *Id.* at 205. They were not responsible for the management of individual cases, did not supervise other staff, and did not have regular contact with elected officials. *See id.* Even though we found that it was possible that they enjoyed civil service protection, *see id.* at 209, we held that they did not enjoy First Amendment protection against patronage dismissal, in part because their "broad duty of providing legal counsel to the Department and assisting the legal division .... may at times require [them] to be employed in a way that requires confidentiality of information encompassing political and ideological concerns." *Id.* at 208. We also observed that, unlike the Assistant Public Defenders in *Branti,* the Assistant Attorneys in *Vona* "represent[ed] the County rather than individual clients." *Id.*

In the instant case, Bureau Associate and Assistant Counsels "[a]dvise Department of Health program staff [on] aspects of Professional Medical Conduct," serving in much the same legal advisory capacity as did the Assistant Attorneys in *Vona.* We have elsewhere rejected the argument that government attorneys may invoke First Amendment protection against patronage dismissal on the grounds that they "merely gave legal advice when requested to do so" and that their jobs were otherwise "politically neutral and essentially technical in nature." *See Gordon,* 110 F.3d at 891 (internal quotation marks omitted). We believe that legal advice offered by Associate and Assistant Counsels to Department staff inherently implicates matters of

policy and extends well beyond mere ministerial or "technical" duties.

Associate and Assistant Counsels also each "[d]etermine litigation strategy." Associate Counsels in particular are expressly charged with doing so while "taking into account ... impact on public policy." These prosecutorial duties necessarily entail "independent judgment regarding department policies and procedures." *Savage,* 850 F.2d at 69. Indeed, "[i]t is difficult to fathom how such responsibilities can be undertaken and done well without ... political or social philosophy [making] a difference." *Gordon,* 110 F.3d at 890 (internal quotation marks and citation omitted). We note as well that like the Assistant Attorneys in *Vona,* and unlike the Assistant Public Defenders in *Branti,* the Associate and Assistant Counsels do not merely represent individual clients. Rather, they represent the State and must therefore reflect and implement the views of policymakers in prosecuting professional medical misconduct cases that may often be the source of public controversy.

In sum, our review of the "inherent duties" of Associate and Assistant Counsels persuades us that there is a "rational connection between shared ideology and job performance," so that "political affiliation is an appropriate [job] requirement" of these positions. *See Savage,* 850 F.2d at 68. We therefore hold that these positions do not enjoy First Amendment protection from dismissal on the basis of political affiliation.

### III.

Accordingly, the district court's orders granting summary judgment for defendants are affirmed.

---

7. The job description in *Vona* required that an Assistant Attorney

    assist[ ] the Social Services Attorney in conducting litigation, and performing legal research, assist[ ] and provid[e] legal counsel to the Social Services Department, assist[ ] in

preparation of and representation at Fair Hearing for the general public as clients, and do[ ] related work as necessary to assist in the functioning of the legal division of the Social Services Department.

*Vona,* 119 F.3d at 204.